IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 20-cv-02849-CMA-SKC

REVIVE INVESTING LLC, and
DONNA ANN GABRIELE CHECHELE,

    Plaintiffs,

v.

ARMISTICE CAPITAL MASTER FUND, LTD.,

    Defendant,

and

AYTU BIOSCIENCES, INC.

    Nominal Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

This matter is before the Court on Defendant Armistice Capital Master Fund, LTD.'s ("Master Fund") Motion to Dismiss for lack of subject matter jurisdiction. (Doc. # 110.) For the following reasons, the Motion is denied.

## I.    BACKGROUND

This is an insider trading case in which Plaintiffs Revive Investing LLC and Donna Ann Gabrielle Chechele allege that Defendants violated Section 16(b) of the Securities Exchange Act of 1934 by engaging in short-swing trading of their securities.

The following facts are taken from Plaintiffs' Complaint (Doc. # 1) and are accepted as true for purposes of reviewing the Motion to Dismiss.

## A. FACTUAL BACKGROUND

Plaintiffs are stockholders of Aytu BioPharma, Inc., f/k/a Aytu BioSciences, Inc. ("Aytu"), a Delaware corporation headquartered in Englewood, Colorado. (Doc. # 1 at ¶¶ 1–3.) They allege that at all times relevant to this action, Defendant Master Fund was the beneficial owner of more than 10% of the common stock of Aytu ("Common Stock"). (*Id.* at ¶ 18.) Armistice Capital, LLC ("Capital") was the investment manager of Master Fund, and Steven Boyd was a managing member of Capital and a director of Master Fund. (*Id.* at ¶¶ 19–20.) Plaintiffs allege that Master Fund, Capital, and Boyd constitute a "group" with respect to investment in Aytu within the meaning of 17 C.F.R. § 240.13d-5(b)(1) ("Armistice Group") and that the Armistice Group was the beneficial owner of more than 10% of the Common Stock of Aytu during all relevant time periods. (*Id.* at ¶¶ 21–22.)

Plaintiffs allege insider trading by Master Fund through transactions in the Common Stock entered into between October 11, 2019, and March 10, 2020. (*Id.* at ¶ 13.) On a Form 4 filed by the Armistice Group on October 16, 2019, Master Fund reported an acquisition from Aytu of 5,000 shares of Series F Convertible Preferred Stock ("Convertible Preferred") and 5,000,000 warrants to acquire the Common Stock ("Warrants"). (*Id.* at ¶ 23; Doc. # 1-1.) The Convertible Preferred was convertible into Common Stock at a rate of $1.00 face amount of Convertible Preferred per share of Common Stock, or 5,000,000 shares of Common Stock, upon approval by the Aytu

2

shareholders. (Doc. # 1 at ¶ 24.) The Warrants were exercisable at a price of $1.25 per share of Common Stock upon approval by the Aytu shareholders. (*Id.* at ¶ 25.)

The Aytu shareholders approved the Convertible Preferred and Warrants at a special meeting on January 24, 2020. (*Id.* at ¶ 26.) On the date of the shareholder approval, the average market price of the Common Stock was $0.82 per share. (*Id.* at ¶¶ 29–30.)

On another Form 4 filed by the Armistice Group on December 23, 2019, the Armistice Group reported a purchase on December 19, 2019, by Master Fund of 52,788 shares of Common Stock at a weighted average price of $0.85 per share. (*Id.* at ¶ 31; Doc. # 1-2.) On the same Form 4, the Armistice Group reported a purchase on December 20, 2019, by Master Fund of 26,000 shares of Common Stock at a weighted average price of $0.88 per share. (Doc. # 1 at ¶ 31; Doc. # 1-2.)

On March 10, 2020, Armistice sold 19,569,979 shares of Common Stock at a weighted average price of $1.47 per share. (Doc. # 1 at ¶ 33; Doc. # 1-3.) The Armistice Group reported this sale on a Form 4 on March 12, 2020. (Doc. # 1 at ¶ 33; Doc. # 1-3.) On the same Form 4, the Armistice Group reported another sale by Armistice on March 10, 2020, of 2,456,822 shares of Common Stock at a weighted average price of $0.99 per share. (Doc. # 1 at ¶ 34; Doc. # 1-3.) On March 13, 2020, the Armistice Group reported the individual March 10, 2020 sales from which the weighted average price reported on the March 12, 2020 Form 4 were computed. (Doc. # 1 at ¶ 35; Doc. # 1-4.)

Plaintiffs allege that through these transactions, Master Fund sold a total of 22,026,801 shares of Common Stock resulting in proceeds of $31,224,692.12. (Doc. # 1

at ¶ 36.) According to Plaintiffs, these transactions fall within Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)"), which prohibits a beneficial owner from engaging in short-swing trading within a period of six months. (*Id.* at ¶¶ 37–38.) Plaintiffs assert that Master Fund is accountable to Aytu for any illicit profit realized through these transactions, plus interests and costs. Using the "lowest-in, highest-out method" endorsed by the Securities and Exchange Commission, Plaintiffs calculate that Master Fund realized illicit profits in the amount of at least $8,364,415.28 from these transactions. (*Id.* at ¶¶ 39–40.)

In their Complaint, Plaintiffs assert two claims for relief on behalf of Aytu: (1) disgorgement of all profits realized by Master Fund resulting from short-swing trading during all periods not barred by the relevant statute of limitations in an amount of at least $8,364,415.28 pursuant to Section 16(b), plus interest and costs; and (2) "an accounting from [Master Fund] of all transactions in the equity securities of Aytu from the date two years preceding the filing of this Complaint to the present" in order to fully evaluate Plaintiffs' claim. (*Id.* at ¶¶ 42–46.)

B.     PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 21, 2020. (*Id.* at 8.) The parties completed discovery, and on December 16, 2022, and January 17, 2023, the parties filed cross-motions for summary judgment. (Docs. ## 78, 86.) After an extended briefing schedule, both summary judgment motions are fully briefed and ripe for review as of May 16, 2023. (Docs. ## 93, 94, 102, 103, 109.)

On May 24, 2023, after summary judgment briefing concluded, Master Fund filed the instant Motion to Dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3). (Doc. # 110.) Master Fund argues that in light of the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Complaint must be dismissed for Plaintiffs' failure to allege a concrete injury in fact sufficient for Article III standing. Plaintiffs timely filed a Response (Doc. # 111), and Master Fund submitted its Reply (Doc. # 113). In addition, Plaintiffs filed a Conditional Motion for Leave to Amend Complaint (Doc. # 114), which Plaintiffs assert may be denied as moot should the Court find that their original Complaint adequately alleges standing. The Court also notes that Plaintiffs filed a Notice of Supplemental Authority (Doc. # 117), and Master Fund filed an Unopposed Motion for Leave to Respond to the Notice of Supplemental Authority (Doc. # 120). The Court grants Master Fund's Unopposed Motion for Leave to Respond (Doc. # 120) and has fully considered the response attached thereto.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may to move to dismiss a complaint for "lack of subject matter jurisdiction." Because subject matter jurisdiction cannot be waived, a party may challenge subject matter jurisdiction "at any time prior to final judgment." *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) (quoting *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004)); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

A Rule 12(b)(1) challenge generally takes one of two forms: (1) a facial attack, where the moving party may "attack the complaint's allegations as to the existence of subject matter jurisdiction"; or (2) a factual attack, where the moving party may "go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When reviewing a facial attack, as in the instant case, the Court must accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

### III. DISCUSSION

Master Fund moves to dismiss the Complaint in the wake of *TransUnion*, in which the Supreme Court held that alleging a statutory violation alone, without also establishing a concrete injury in fact, is insufficient to establish Article III standing. (Doc. # 110 at 2.) According to Master Fund, Plaintiffs' claims must be dismissed because Plaintiffs have pleaded only a bare violation of Section 16(b). Plaintiffs respond that under the concrete injury inquiry outlined in *TransUnion*, the allegations in the Complaint are sufficient to establish a concrete intangible harm sufficient for Article III. After carefully reviewing the applicable law, the Court agrees with Plaintiffs.

### A. STANDING

The Court will first review the general legal framework for constitutional standing and then the recent Supreme Court decisions addressing the difference between statutory violations and concrete injuries in fact.

1.   General Legal Framework

Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. To establish a case or controversy, a plaintiff must have a "'personal stake' in the case—in other words, standing." *TransUnion*, 141 S. Ct. at 2203 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Put differently: "[t]o demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *Id.* (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881, 882 (1983)).

To establish standing, a plaintiff must show (i) he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) the injury was likely caused by the defendant; and (iii) the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Article III standing is "a fundamental requirement for any party seeking relief in federal court." *United States v. Colo. & E. R.R. Co.*, 882 F.3d 1264, 1269 (10th Cir. 2018). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *TransUnion*, 141 S. Ct. at 2203 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing. *Id.* at 2207.

2.   Recent Developments

The issue before the Court is injury in fact—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not

7

conjectural or hypothetical." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560). Historically, courts held that Article III standing could "exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)). However, in two recent decisions—*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) and *TransUnion*—the Supreme Court addressed the "concrete" and "particularized" requirements of "injury in fact" and clarified that alleging a statutory violation alone does not necessarily establish standing for purposes of Article III.

In *Spokeo*, the Court stated that to be "concrete" an injury must "actually exist" and must be "real" rather than "abstract." 578 U.S. at 340. "Concrete" is not "necessarily synonymous with 'tangible.'" *Id.* The Court advised that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* First, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. Second, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Id.* Thus, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* (quoting *Lujan*, 504 U.S. at 578). However, the Supreme Court cautioned that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact

requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* Stated differently, a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.*

*TransUnion* expanded upon the principles in *Spokeo* and put it bluntly: "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200. Writing for the Court, Justice Kavanaugh explained:

> Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment. As Judge Katsas has rightly stated, "we cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so."

*Id.* at 2205 (citation omitted) (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999 n.2 (11th Cir. 2020)). Thus, for standing purposes, a difference exists between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* The Court warned that absent the concrete harm requirement, "Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *Id.* at 2206.

After concluding that merely alleging a statutory violation is not enough to establish standing, the Supreme Court provided guidance for how to determine what makes a harm "concrete" for purposes of Article III. Traditional tangible harms, like

physical and monetary harms, "readily qualify as concrete injuries under Article III." *Id.* at 2204. Intangible harms can also be concrete. *Id.* To illustrate concrete intangible harms, the Court pointed to "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* In determining whether a harm is sufficiently concrete to qualify as an injury in fact, courts "should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 341). This inquiry "asks whether plaintiffs have identified a **close historical or common law analogue** for their asserted injury." *Id.* (emphasis added). However, the inquiry "does not require an exact duplicate in American history and tradition." *Id.* Courts must also "afford due respect to Congress's decision to impose a statutory prohibition or obligation to a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.*

In the aftermath of *TransUnion*, the legal landscape of standing has shifted. Before *TransUnion*, courts routinely held that Congress, by statute, can create rights that would not otherwise exist and that infringement of those rights is a sufficient injury to permit standing to sue in federal court. *See, e.g.*, *Warth*, 422 U.S. at 514 ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute."). After *TransUnion*, courts have scrutinized standing more closely in the context of a litany of federal statutes, often with mixed results.

*Compare, e.g.*, *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823 (10th Cir. 2022) (no concrete injury for standing under the Fair Debt Collection Practices Act ("FDCPA")), *with Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021) (concrete injury for standing under the FDCPA); *see also Packer ex rel. 1-800 Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, No. 15-CV-05933 (JMW), 2023 WL 2484442, at *4 (E.D.N.Y. Mar. 13, 2023) (collecting cases with differing outcomes as to standing for claims brought under the FDCPA, the Fair Credit Reporting Act ("FCRA"), and the Americans with Disabilities Act ("ADA")).

After *TransUnion*, it is now clear that Article III standing requires concrete injury even in the context of a statutory violation. 141 S. Ct. at 2205. To determine whether an alleged intangible harm is sufficiently concrete for Article III, courts must look to common law and history for a suitable analogue. *See Packer*, 2023 WL 2484442, at *4 (stating that the "bedrock of the concrete injury inquiry" is whether the alleged injury has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts); *see also* Edwin Chemerinsky, *What's Standing After TransUnion LLC v. Ramirez?*, 96 N.Y.U. L. Rev. Online 269, 283–86 (2021) (discussing the implications of *TransUnion* with respect to multiple examples of federal statutes addressing harms for which there is no "close analogue" historically or at common law). With this evolved legal backdrop in mind, the Court turns to Master Fund's argument that pleading a violation of Section 16(b) of the Securities Exchange Act of 1934 is insufficient to establish injury in fact for purposes of Article III standing.

B.     SECTION 16(b)

Under Section 16(b), a shareholder "may bring suit against the officers, directors, and certain beneficial owners[1] of [a] corporation"—i.e., corporate insiders—"who realize any profits from the purchase and sale, or sale and purchase, of the corporation's securities within any 6-month period." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 223 (2012). These are known as "short-swing" profits. *Olagues v. Muncrief*, 760 F. App'x 620, 623 (10th Cir. 2019) (unpublished). If a shareholder proves that a statutory insider realized such short-swing profits, Section 16(b) compels those insiders to disgorge those profits. *Magma Power Co. v. Dow. Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998).

Section 16(b) does not require proof of trading based on insider information; instead, it "'imposes a form of strict liability' and requires insiders to disgorge these 'short-swing' profits 'even if they did not trade on inside information or intend to profit on the basis of such information.'" *Credit Suisse*, 566 U.S. at 223 (quoting *Gollust v. Mendell*, 501 U.S. 115, 122 (1991)); *see also Magma Power*, 136 F.3d at 320 ("No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement."). As several courts have recognized, "Congress believed that such a blunt instrument was the only way to control insider trading" in the wake of the collapse of the American stock market in 1929. *Magma Power*, 136 F.3d at 321; *see Smolowe v. Delendo Corp.*, 136 F.2d 231, 235 (2d Cir. 1943) ("Prior to the passage of

---

[1] Section 16(b) regulates beneficial owners of more than 10% of any class of equity securities. 15 U.S.C. § 78p(a)(1).

the Securities Exchange Act, speculation by insiders—directors, officers, and principal stockholders—in the securities of their corporation was a widely condemned evil."). "[T]he only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

Section 16(b) differs from other federal securities laws in that it "does not confer enforcement authority on the Securities and Exchange Commission." *Gollust*, 501 U.S. at 122. Instead, the statute "authorizes two categories of private persons to sue for relief": (1) the issuer of the security traded in violation of Section 16(b); or (2) "the owner of any security of the issuer"—i.e., a shareholder—"in the name and in behalf of the issuer," but only "if the issuer shall fail or refuse to bring such suit within sixty days after the request or shall fail diligently to prosecute the same thereafter." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 174 (2d Cir. 2012) ("*Bulldog*"). Where a shareholder brings a Section 16(b) claim on behalf of an issuer, the suit is referred to as a "derivative suit." *See id.* at 175 (explaining that a derivative suit is a procedural device to enforce substantive rights belonging to the issuer as the "real party in interest"). According to the Supreme Court, "Congress clearly intended to 'put a private-profit motive'" within Section 16(b) "by making the stockholders its policemen" for enforcement. *Gollust*, 501 U.S. at 124–25 (alterations adopted) (quoting Hearings on H.R. 7852 and H.R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 136 (1934) (testimony of Thomas G. Corcoran)).

**C.     CONCRETE INJURY**

The question before the Court, then, is whether the harm proscribed by Section 16(b) constitutes a "concrete injury" for purposes of Article III standing. Master Fund argues that it does not because "a bare statutory violation of Section 16(b) cannot be analogized to a traditional harm giving rise to standing." (Doc. # 110 at 8.) Plaintiffs, however, contend that Section 16(b) has its roots in the common law of trusts and, therefore, the particular intangible harm addressed by Section 16(b) does give rise to injury in fact under the test outlined in *TransUnion*. (Doc. # 111 at 5–10.)

Two courts have now addressed this exact question: *Packer ex rel. 1-800 Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, No. 15-cv-05933 (JMW), 2023 WL 2484442 (E.D.N.Y. Mar. 13, 2023), and *Avalon Holdings Corp. v. Gentile*, No. 18cv7291 (DLC), 18cv8896 (DLC), 2023 WL 4744072 (S.D.N.Y. July 25, 2023). The two cases came to entirely opposite results. First, the *Packer* court determined that *TransUnion* overruled relevant Second Circuit precedent in *Bulldog* that alleging a violation of Section 16(b) alone sufficiently confers Article III standing upon the issuing corporation or derivative shareholder. *Packer*, 2023 WL 2484442, at *10. As such, the *Packer* court concluded that a plaintiff who had alleged only a violation of Section 16(b) failed to establish a concrete injury in fact and dismissed his complaint for lack of standing. *Id.* The *Avalon* court, by contrast, held that *TransUnion* did not disturb *Bulldog* because *Bulldog* reasoned that the harm suffered by a Section 16(b) plaintiff "was akin to the common law injury of breach of trust." *Avalon*, 2023 WL 4744072, at *6. Finding that *Bulldog* "is entirely compatible with *TransUnion*," the *Avalon* court determined that the

plaintiff had adequately alleged facts establishing concrete harm for Article III and denied the motion to dismiss. *Id.*

These two cases are not perfect models for the inquiry that this Court must undertake. Significantly, both *Packer* and *Avalon* had to grapple with the threshold question of whether the Supreme Court's opinion in *TransUnion* overruled binding Second Circuit precedent in *Bulldog*. Because *Bulldog* is only persuasive authority in this district, the Court need not engage in the same extensive stare decisis analysis. *See Packer*, 2023 WL 248442, at *7 (explaining that "[s]tare decisis means that district courts are bound by the decisions of their respective Circuit Courts of Appeal unless there is an intervening Supreme Court or en banc panel circuit decision that casts doubt on the controlling precedent" (internal quotation marks, footnote, and citation omitted)). Nevertheless, upon carefully reviewing all three cases, the Court is persuaded by the reasoning in *Avalon* and *Bulldog* that a Section 16(b) claim is analogous to the common law of trusts and therefore suffices to establish a concrete harm within the test outlined in *TransUnion*.

In 2012, well before *TransUnion*, the Second Circuit in *Bulldog* set forth its understanding of the theory of injury suffered by a Section 16(b) plaintiff. It observed that in a prior case, the Second Circuit had recognized that Section 16(b)'s strict liability provision applying to 10% beneficial owners "effectively makes 10% 'beneficial owners fiduciaries as directors and officers were anyway,' at least to the extent of making all short-swing transactions by such persons in the issuer's stock 'breaches of trust.'" *Bulldog*, 696 F.3d at 177 (quoting *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir. 1951)).

15

Applying this reasoning, the Second Circuit concluded that "Bulldog cannot maintain that it owed no fiduciary duty to [the issuing company.] That fiduciary duty was created by § 16(b), and it conferred upon [the company] an enforceable legal right to expect Bulldog to refrain from engaging in any short-swing trading in its stock." *Id.* The court continued:

> As Judge Hand explained, even at common law, a fiduciary's duty to a beneficiary often required more than the avoidance of actual unfair dealing: "'A trustee with power to sell trust property is under a duty not to sell to himself either at private sale or at auction, whether the property has a market price or not, and whether the trustee makes a profit thereby.'" *Gratz v. Claughton*, 187 F.2d at 49 (quoting Restatement of Trusts § 170(1), cmt. b). Drawing an analogy between trust law and the fiduciary duty created by § 16(b), Judge Hand observed that "[n]obody is obliged to become a director, an officer, or a 'beneficial owner'; just as nobody is obliged to become the trustee of a private trust; but, as soon as he does so, he accepts *whatever* are the limitations, obligations and conditions attached to the position, and any default in fulfilling them is as much a 'violation' of law as though it were attended by the sanction of imprisonment." *Id.*

*Id.* Thus, the Second Circuit determined that when a stock purchaser chooses to acquire a 10% beneficial ownership stake in an issuer, "he becomes a corporate insider and thereby accepts the limitation that attaches to his fiduciary status: not to engage in any short-swing trading in the issuer's stock." *Id.* (quoting *Gratz*, 187 F.2d at 49). The duty extends to the appearance of insider trading because a "corporate issuer, after all, has an 'interest in maintaining a reputation of integrity, an image of probity . . . and in insuring the continued public acceptance and marketability of its stock.'" *Id.* at 177–78 (quoting *Diamond v. Oreamuno*, 248 N.E.2d 910, 912 (N.Y. 1969)).

Finding the theory of injury set forth in *Bulldog* to be persuasive, this Court agrees with Plaintiffs and the court in *Avalon* that "the harm suffered by a § 16(b)

plaintiff . . . [is] akin to the common law injury of breach of trust arising from the 10% beneficial owner's fiduciary duty to the issuer." *Avalon*, 2023 WL 4744072, at *6. As Plaintiffs correctly note, the law of trusts analogized to in *Bulldog* is deeply rooted in the common law. Courts in this country have long held that "[i]t is a well-settled principle of equity, that wherever a trustee, or one standing in a fiduciary character, deals with the trust estate for his own personal profit, he shall account to the *cestui que trust* for all the gain which he has made." *Barney v. Saunders*, 57 U.S. 535, 543 (1853). Further, courts considered it immaterial whether the trustee or agent actually profited from the transaction based on advantage or unfairness. *See, e.g.*, *Perkins v. McGavock*, 4 Tenn. 265, 269 (Tenn. 1817) ("But the rule is, that a trustee can not act for himself . . . . And it is no objection to the application of this rule, that the trustee or agent has made no advantage by such act, for equity disallows the measure upon the general principle, without reference either to advantage or unfairness." (citation omitted)). Rather, the act of self-dealing, regardless of profit or fraud, was enough to constitute an intolerable breach of trust. *See, e.g.*, *Lazarus v. Bryson*, 3 Binn. 54 (Pa. 1810) (analogizing to trust law and stating that "it will not endure that the same person should be both seller and purchaser. Not but that in many cases, the sale might in fact be fair and honourable; but from a principle of the soundest policy, from the temptation to dishonest practices, to which the officer would be exposed, and from the difficulty of detecting him, where he acted fraudulently. I consider this principle as settled").

      The Court also notes that the analogue between Section 16(b) and a breach of fiduciary duty claim has been recognized long before *Bulldog*. *See, e.g.*, *Am. Standard,*

17

*Inc. v. Crane Co.*, 510 F.2d 1043, 1060 (2d Cir. 1974) (analyzing the legislation history of Section 16(b) and stating, "Congress was concerned about the 'outside' owners of securities which were being cavalierly traded by fiduciaries whom the stockholders had elected to positions of trust. **The stress was on fiduciary responsibility**. The purpose of [Section 16(b)] was to prevent directors, officers and principal stockholders 'from speculating in the stock of the corporations **to which they owed a fiduciary duty**'" (emphases added) (quoting S.Rep. No. 1455, 73rd Cong. 2d Sess. 68 (1934))); *accord Adler v. Klawans*, 267 F.2d 840, 844 (2d Cir. 1959) ("The undoubted congressional intent in the enactment of § 16(b) was to discourage what was reasonably thought to be a **widespread abuse of a fiduciary relationship**—specifically to discourage if not prevent three classes of persons from making private and gainful use of information acquired by them by virtue of their official relationship to a corporation." (emphasis added)). Indeed, some courts before and after the passage of the Securities Exchange Act of 1934 have endorsed common law breach of fiduciary claims arising from insider trading. *See, e.g.*, *Goodwin v. Agassiz*, 186 N.E. 659, 661 (Mass. 1933) (stating that a director having insider information creates an "obligation to observe every requirement of fair dealing" in buying and selling stock such that "relief may be granted in appropriate instances" where a director engages in trading based that knowledge); *Diamond*, 248 N.E.2d at 914 ("[T]he alleged use of the inside information to dispose of their stock at a price considerably higher than its known value constituted the same sort of 'abuse of fiduciary relationship' as is condemned by the Federal law. Sitting as we

are in this court of equity, we should not hesitate to permit an action to prevent any unjust enrichment realized by the defendants from their allegedly wrongful act.").

In sum, the *Transunion* inquiry "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." 141 S. Ct. at 2204. Plaintiffs in this case have done so. The Court finds that a harm suffered by a Section 16(b) plaintiff is analogous to the common law injury of breach of trust. *See Bulldog*, 696 F.3d at 177–78; *Avalon*, 2023 WL 4744072, at *3–*6; *see also* Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*, 32 N.Y.L. Sch. L. Rev. 209, 344 (1987) ("The issuer's recovery of an insider's profit has common law antecedents . . . . [t]he legislative history and the Second Circuit support this common law analogy."). To the extent that Master Fund objects that the analogy to trust law is a "dubious position" and that a Section 16(b) claim is distinguishable on several grounds (Doc. # 113 at 3–4), the Court notes that the Supreme Court explicitly stated that the inquiry "does not require an exact duplicate in American history and tradition." *TransUnion*, 141 S. Ct. at 2204. Moreover, the Court "must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant." *Id.* By proscribing short-swing trading by corporate insiders, Congress addressed the intangible harm—recognized at common law—of a fiduciary breach of trust. As such, it is clear to this Court that Section 16(b) is not an example of Congress "using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

In their Complaint, Plaintiffs adequately allege that Master Fund is a corporate insider that engaged in short swing trading of Aytu's securities. The Court is therefore satisfied that Plaintiffs have met their burden under *TransUnion* of establishing a concrete intangible harm sufficient to demonstrate standing under Article III.

## IV.   CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

- Defendant's Unopposed Motion for Leave to Respond to Plaintiff's Notice of Supplemental Authority (Doc. # 120) is GRANTED. The response is accepted as filed.

- Defendant's Motion to Dismiss for lack of subject matter jurisdiction (Doc. # 110) is DENIED.

- Accordingly, Plaintiffs' Conditional Motion for Leave to Amend Under Fed. R. Civ. P. 15(a)(2) (Doc. # 114) is DENIED AS MOOT.

DATED:  August 18, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge