**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 20-cv-02849-CMA-SKC

REVIVE INVESTING LLC, and
DONNA ANN GABRIELE CHECHELE,

      Plaintiffs,

v.

ARMISTICE CAPITAL MASTER FUND, LTD.,

      Defendant,

and

AYTU BIOSCIENCES, INC.

      Nominal Defendant.

---

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

---

      This matter is before the Court on (1) Plaintiffs Revive Investing LLC and Donna Anna Gabriele Chechele's Motion for Summary Judgment (Doc. # 76); and (2) Defendant Armistice Capital Master Fund, LTD.'s ("Master Fund") Motion for Summary Judgment (Doc. # 86). For the following reasons, the Court grants in part and denies in part Plaintiffs' Motion and denies Defendant Master Fund's Motion.

## I.   <u>BACKGROUND</u>

This is an insider trading case alleging short-swing trading of securities in violation of Section 16(b) of the Securities Exchange Act of 1934. Unless otherwise indicated, the following material facts are undisputed.

Plaintiffs are stockholders of Aytu BioPharma, Inc, f/k/a Aytu BioSciences, Inc. ("Aytu"), a pharmaceutical company incorporated in Delaware and headquartered in Englewood, Colorado. (Doc. # 77 at 14–39; 432.) Defendant Master Fund, a company based in the Cayman Islands, is a "pooled investment vehicle" with over $1 billion in assets. (Doc. # 77 at 571; Doc. # 86-3 at 3.) Master Fund is affiliated with Armistice Capital, an investment manager registered with, and subject to oversight by, the Securities and Exchange Commission ("SEC"). (Doc. # 86-2 at 3.) Both Master Fund and Armistice Capital were founded in 2012 by Steven Boyd, who serves as the Chief Investment Officer and Managing Member of Armistice Capital. (*Id.* at 2–3.) Mr. Boyd is also one of three directors on the Master Fund board of directors, along with Kevin Phillip and Gregory Bennett ("Master Fund Board"). (*Id.* at 3.)

Since Master Fund was founded, it has engaged Armistice Capital to manage Master Fund's investments through an investment management agreement. (*Id.*) The investment management agreement in effect during the time period relevant to this action was signed in April 2018 ("IMA"). (Doc. # 86-11 at 2.) The IMA provides that Armistice Capital will make "[a]ll investment decisions" regarding the securities held in Master Fund's portfolio. (*Id.*) The parties dispute whether Armistice Capital possessed exclusive authority to invest the assets of Master Fund and make all decisions

concerning those assets, or whether Master Fund also retained such authority. *Compare* (Doc. # 86 at 6–7), *with* (Doc. # 102 at 2–3). The parties also dispute whether Master Fund retained voting power over the securities in its portfolio and whether Armistice Capital had the authority to place representatives on boards of directors of certain companies in which Master Fund invested. *Compare* (Doc. # 86 at 6–7), *with* (Doc. # 102 at 2–3.)

Master Fund began investing in Aytu in 2017. (Doc. # 86 at 2.) Between August 2017 and October 2018, Master Fund "accumulated a sizable position in Aytu securities," owning just under 10% of Aytu's stock. (Doc. # 86-2 at 5.) In October 2018, Joshua Disbrow, Aytu's Chief Executive Officer and Chairman of its Board, approached Mr. Boyd about the possibility of joining Aytu's Board of Directors ("Aytu Board"). (*Id.*) Mr. Boyd was appointed to the Aytu Board on April 15, 2019, and served as a director until August 30, 2021. (*Id.* at 6.) He informed the Master Fund Board that he had joined the Aytu Board at a quarterly meeting in the spring of 2019. (*Id.*) The parties vigorously dispute whether Mr. Boyd was appointed to the Aytu Board for the purpose of representing Master Fund's interests, or whether Mr. Boyd was appointed in his individual capacity. *Compare* (Doc. # 86 at 7–9), *with* (Doc. # 102 at 3–4).

On October 10, 2019, the Aytu Board voted to approve Master Fund's purchase of 5,000 shares of Aytu's Series F Convertible Preferred Stock ("Convertible Preferred") and warrants to purchase 5,000,000 shares of Aytu's common stock ("Warrants") (collectively, "October Acquisitions"). (Doc. # 86 at 11; Doc. # 77 at 170.) On January 24, 2020, Aytu's shareholders voted to approve the convertibility of the Convertible

Preferred shares and the exercisability of the Warrants. (Doc. # 86-29.) The average of the high and low price of Aytu's common stock on the date of the special meeting was $0.82 per share. (Doc. # 77 at 664.) In addition to its purchase of the Convertible Preferred and Warrants, Master Fund reported two additional open-market stock purchases on a Form 4 filed on December 23, 2019: 52,788 shares at the price of $0.85, and 26,000 shares at the price of $0.88. (*Id.* at 253.) Both purchases occurred on December 19, 2019 ("December Purchases"). (*Id.*) After these acquisitions, Master Fund owned 40% of the outstanding shares of Aytu. (*Id.* at 346.)

At 8:05 a.m. on March 10, 2020, in the early days of the COVID-19 pandemic, Aytu announced in a press release that it had secured exclusive rights to market in North America a Hong Kong-sourced rapid COVID test. (*Id.* at 59.) The same day, Master Fund began selling all of its Aytu common stock. *See* (*id.* at 5–9.) According to Plaintiffs, Master Fund "largely cashed out of its investment in Aytu, all in a single day" by selling over 20 million shares with proceeds of more than $31 million. (Doc. # 76 at 2.) Specifically, Armistice Capital, on behalf of Master Fund, converted shares of Aytu preferred stock into common stock, exercised certain warrants to purchase Aytu common stock, and sold 22,026,801 shares of Aytu common stock on March 10, 2020. (Doc. # 86-31 at 11–14.)

On a March 12, 2020 Form 4, Master Fund disclosed that it had realized certain putative short-swing profits as a result of these transactions. (Doc. # 86-30 at 4.) The same day that it filed the Form 4, Master Fund and its affiliates entered into a settlement agreement with Aytu ("Settlement Agreement") pursuant to which Master Fund

disgorged $92,879.85 to Aytu. (Doc. # 86-18.) Plaintiffs contend that Master Fund's full profit on its short-swing trades—i.e., the shares it sold within a period of less than six months after purchase—is $11,256,326.42. (Doc. # 76 at 14.) Accordingly, Plaintiffs contend that the amount of illicit profits still subject to disgorgement is $11,163,446.67. (*Id.* at 15.)

Plaintiffs filed their Complaint as a derivative action on behalf of Aytu on September 21, 2020. (*Id.* at 8.) The parties completed discovery, and on December 16, 2022, and January 17, 2023, the parties filed the instant cross-motions for summary judgment. (Docs. ## 76, 86.) Both summary judgment motions are fully briefed and ripe for review. (Docs. ## 93, 94, 102, 103, 109.)

## II.     LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III.   DISCUSSION

Both parties move for summary judgment in their favor on Plaintiffs' claim that Master Fund violated Section 16(b) of the Securities Exchange Act of 1934 ("Section 16(b)") by engaging in short-swing trading of Aytu's securities. (Doc. # 76 at 4.) The Court will begin by reviewing the applicable law for Section 16(b) claims.

A.      **SECTION 16(b)**

To prevent insiders of a securities issuer from trading on non-public information, Section 16(b) provides that officers, directors, and holders of more than 10% of the listed stock of any company are liable to the company for any profits realized "from the purchase and sale, or sale and purchase, of the [company's] securities within any 6-month period." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 223 (2012). These are known as "short-swing" profits. *Olagues v. Muncrief*, 760 F. App'x 620, 623 (10th Cir. 2019) (unpublished). If a shareholder proves that a statutory insider realized such short-swing profits, Section 16(b) compels those insiders to disgorge those profits. *Magma Power Co. v. Dow. Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998).

In order to prevail on a Section 16(b) claim, a plaintiff must prove: (1) a purchase and (2) sale of non-exempt equity securities or derivative securities (3) by an insider of the issuer (4) within a less than six-month period (5) resulting in profit. 15 U.S.C. § 78p(b); *see Rubenstein v. Very Hungry, LLC*, No. 14-cv-00888-CMA-CBS, 2015 WL 1509761, at *2 (D. Colo. Mar. 30, 2015). Section 16(b) imposes strict liability for short-swing trading regardless of the trader's intent or whether he actually traded on inside information. *See Credit Suisse*, 566 U.S. at 223; *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121–22 (2d Cir. 2001).

There appears to be no dispute that Master Fund purchased and sold Aytu securities within a less than six-month period resulting in a profit. The two issues raised by the instant motions for summary judgment are (1) whether Master Fund is an "insider" under Section 16(b) as a "beneficial owner," and (2) whether the transactions

are exempt pursuant to Rule 16b-3 on the basis that Master Fund was a "director by deputization." In addition, Master Fund moves for summary judgment on the separate basis that Plaintiffs' claims have been settled and released. (Doc. # 86 at 29.) The Court will address each matter in turn.

## B.   WHETHER MASTER FUND IS A BENEFICIAL OWNER

Master Fund contends that Plaintiffs' claim must fail because Plaintiffs cannot establish that Master Fund was a statutory insider as a 10% beneficial owner of Aytu securities. (Doc. # 86 at 17–19.) Plaintiffs, however, maintain that they are entitled to summary judgment on the basis that undisputed material facts demonstrate that Master Fund *was* a beneficial owner. (Doc. # 76 at 15–21.)

The relevant rule provides:

[A] beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or;

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a); *see also* 17 C.F.R. § 240.16a-1 (providing that a beneficial owner under Section 16(b) "shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder"). In addition, a person is deemed to be a beneficial owner of a security if that person has the right to acquire beneficial ownership of such security within 60 days. *See* 17 C.F.R. § 240.13d-3(d)(1)(i).

Given that beneficial ownership is defined by investing and voting power, some courts have acknowledged that where a security holder has delegated all authority to vote and dispose of its stock to an investment manager and lacks the right under the contract to rescind the authority granted within 60 days, the security holder may no longer be a "beneficial owner" of the security. *See Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 152 (2d. Cir. 2020); *see also Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541, 548 (2d. Cir. 2020) ("Rule 13d-3 defines beneficial ownership not by pecuniary interest in a security but rather by reference to the power to vote or dispose of that security."). Nonetheless, Rule 13d-3 is clear that a beneficial owner of a security includes "any person who, directly **or indirectly** . . . has or otherwise shares" voting power or investment power. 17 C.F.R. § 240.13d-3(a) (emphasis added); *see Greenfield v. Cadian Cap. Mgmt., LP*, 213 F. Supp. 3d 509, 515 (S.D.N.Y. 2016) (finding that a plaintiff adequately pleaded that a security holder who delegated its powers to an investment manager still indirectly retained sufficient control over its securities to maintain beneficial ownership for Section 16(b) liability).

In this case there is no dispute that Master Fund owned more than 10% of Aytu's stock during the relevant time period. However, Master Fund asserts that Plaintiffs cannot establish that it was the beneficial owner of Aytu securities because Master Fund delegated all of its voting and investment authority to its investment manager, Armistice Capital. (Doc. # 86 at 17–19.) Master Fund points to the language of the IMA, which provides that "[a]ll investment decisions" for Master Fund "will be made by" Armistice Capital. (*Id.* at 18; Doc. # 86–11 at 2.) According to Master Fund, this

"unambiguous contractual language makes clear that Master Fund retained no authority to exercise any discretion over investments held in its name." (Doc. # 86 at 18.) Master Fund also cites to the declarations of Master Fund's board members, in which Mr. Boyd, Mr. Phillip, and Mr. Bennett each state that Armistice Capital had exclusive authority to make investment decisions for Master Fund through the IMA. (Doc. # 86-2 at 4; Doc. # 86-3 at 5; Doc. # 86-4 at 5.) Plaintiffs disagree that the IMA delegates all beneficial ownership to Armistice Capital because the IMA says nothing of "voting" power. (Doc. # 102 at 12–13; Doc. # 103 at 7.) In addition, Plaintiffs provide other evidence outside of the IMA indicating that Master Fund retained power to deal with its own property, including Schedules 13G and 13D filings stating that Master Fund shared "voting power" and "dispositive power" with Armistice Capital. *See, e.g.*, (Doc. # 77 at 346, 353.)

   1.   The IMA

The Court begins with the IMA. Under Delaware law, which governs the IMA, the role of a court in interpreting a contract is to effectuate the parties' intent. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) (internal quotation marks and citation omitted). Contract terms are held to be clear and unambiguous "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). "A contract is not rendered ambiguous simply

because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). If a court determines that a provision is ambiguous, the "court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus.*, 702 A.2d at 1233.

The IMA, which refers to Master Fund and other feeder funds collectively as the "Funds" and Armistice Capital as the "Investment Manager," provides:

Section 1.

(a) The Funds hereby retain the Investment Manager and the Investment Manager hereby agrees to act as investment manager of the Funds to be responsible for the investment and reinvestment of the assets of the Funds. **All investment decisions for the Funds will be made by the Investment Manager. . . . [T]he Investment Manager shall have no authority to act for, represent, bind, or obligate the Funds except as provided for herein.**

(b) Such authority of the Investment Manager includes, without limitation, the authority to

(i) purchase, hold, sell, sell short, cover and otherwise deal in securities and financial instruments of any sort and rights therein, including restricted and privately issued securities, on margin or otherwise;

(ii) write, purchase, hold, sell and otherwise deal in put and call options of any sort and in any combination thereof;

(iii) purchase, hold, sell, sell short and otherwise deal in currencies, options thereon and rights therein;

(iv) purchase, hold, sell, and otherwise deal in derivatives, swap contracts, partnership interests, interests in other

> investment companies or any other financial instruments that exist now or are hereafter created;
>
> (v)    conduct margin accounts with brokers, open, . . . maintain and close bank accounts and draw checks or other orders for the payment of moneys, pledge securities for loans and effect borrowings from brokers, banks and other financial institutions;
>
> (vi)    enter into, make and perform any other contracts, agreements or other undertakings it may deem advisable in conducting the business of the Funds, including but not limited to contracts, agreements, or other undertakings with persons, firms or corporations affiliated with the Investment Manager, as may be necessary or proper in connection with the performance of the Investment Manager's duties hereunder . . .;
>
> (vii)    invest all or a portion of the Feeder Funds' assets in other investment vehicles, including the Master Fund; and
>
> (viii)    act for the Funds in all other investment advisory and administrative matters.

(Doc. # 86-11 at 2–3) (emphasis added).

Master Fund argues that the IMA "unambiguously establishes that Master Fund delegated 'all' voting and investment discretion to Armistice Capital." (Doc. # 94 at 26.) Having carefully reviewed the IMA, the Court disagrees. While the IMA certainly provides that "[a]ll investment decisions" will be made by Armistice Capital, such language only shows a delegation of investment power as contemplated by Rule 13d-3. *See* 17 C.F.R. § 240.13d-3(a)(1). But in defining beneficial ownership, Rule 13d-3 explicitly lists both investment power, "which includes the power to dispose, or to direct the disposition of such security," and voting power, "which includes the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3(a). Having either voting

power *or* investment power is sufficient to qualify a person as a beneficial owner under the Rule. *See id.* As Plaintiffs correctly note, "voting" is simply not mentioned anywhere in the IMA. (Doc. # 102 at 13.) The IMA also lacks any language making clear that Armistice Capital held sole or exclusive investment authority of Master Fund's assets.

Despite the lack of any explicit language addressing voting power in the IMA, Master Fund asserts that the authority to make all investment decisions "necessarily included the power to vote shares." (Doc. # 109 at 14.) To bolster this expansive interpretation, Master Fund argues that the IMA describes the authority of the Investment Manager as "without limitation." (Doc. # 86-11 at 2.)  However, the "without limitation" language appears at the beginning of Section 1(b), which contains an enumerated list describing Armistice Capital's *investment* authority. (*Id.*) In Section 1(a)—the same paragraph providing that Armistice Capital will make "[a]ll investment decisions"—the IMA plainly limits the delegation of authority to that expressly provided for within the agreement by stating "the Investment Manager shall have no authority to act for, represent, bind, or obligate the Funds except as provided for herein." (*Id.*) Master Fund otherwise provides no authority supporting its interpretation that the delegation of "[a]ll investment decisions" encompasses voting power.

*Packer*, a Second Circuit opinion that Master Fund cites for its articulation of the delegation theory, cuts against Master Fund's argument. In *Packer*, the court endorsed the SEC's view that "if a security holder 'has delegated all authority to vote and dispose of its stock to an investment advisor' and lacks 'the right under the contract to rescind the authority granted . . . within 60 days,' the security holder does not need to 'report

beneficial ownership' of the securities. 981 F.3d at 152 (citing SEC Division of Corporate Finance, Compliance and Disclosure Interpretations, Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting, Question 105.04 (Sept. 14, 2009)). Applying this logic to a Section 16(b) claim, the Second Circuit considered whether a delegation through an investment management agreement was effective so as to void a security holder's beneficial ownership. Significantly, the IMA at issue in *Packer* provided that the investment manager would make "[a]ll investment decisions"; stated that the investment manager had "exclusive . . . control and discretion" over purchase or sale of the security holder's securities; and explicitly delegated to the investment manager "**sole authority** to exercise all rights, powers, privileges, and other incidents of ownership or possession (including but not limited to, **voting power**) with respect to all such securities and financial instruments held by [the security holder]." *Id.* at 151 (emphases added).[1] *Packer* is thus easily distinguishable. The *Packer* IMA explicitly delegated all voting and investment power to the sole and exclusive discretion of the investment manager; the IMA in the instant case makes no mention of voting power or sole and exclusive discretion at all.

---

[1] *Packer* is also inapposite because the case primarily dealt with a different question of beneficial ownership relating to whether an entity had "the right to acquire beneficial ownership" of the securities within 60 days notwithstanding a 61-day termination provision of the IMA. 981 F.3d at 155–57. The Second Circuit concluded that unresolved factual questions precluded summary judgment on the ultimate issue of whether an individual exercised sufficient control over affiliated entities to commit the entities to altering or terminating an IMA so as to render the 61-day provision meaningless and implicate Rule 13d-3(d). *Id.* at 157. The court therefore remanded for further proceedings and made no definitive ruling on beneficial ownership. *Id.*

For these reasons, the Court finds that the IMA in the instant case unambiguously does not delegate Master Fund's beneficial ownership to Armistice Capital. Although the IMA empowers Armistice Capital to make investment decisions for Master Fund and describes Armistice Capital's authority via an enumerated list of investment-related powers, the IMA does not address voting power and does not make clear that Armistice Capital has sole or exclusive authority to make decisions for Master Fund's securities. *See Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14cv5226 (DLC), 2015 WL 2212215, at *8 (S.D.N.Y. May 12, 2015) ("An entity may be the beneficial owner of securities even when it only indirectly shares or possesses voting and investment power."). In the absence of any language addressing voting power or exclusivity, the Court will not the interpret the IMA to constitute a wholesale delegation of voting power and beneficial ownership. *See Eagle Indus.*, 702 A.2d at 1232 (stating that a contract is unambiguous when it "establish[es] the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language"); *see also Greenfield*, 213 F. Supp. 3d at 515 ("[I]t is not necessarily the case that a party which has executed a contract purporting to delegate such authority has effectively done so."). The Court therefore rejects Master Fund's argument that it delegated its investment and voting power to Armistice Capital such that it no longer qualified as a beneficial owner under Rule 13d-3.

### 2.   Other Evidence

Having determined that the IMA does not establish that Master Fund delegated its voting and investment power to Armistice Capital, the Court finds that the undisputed

material facts show that Plaintiffs are entitled to summary judgment on the issue of whether Master Fund is a beneficial owner.

It is undisputed that Master Fund was the owner of more than 10% of Aytu's common stock during the relevant time period. Plaintiffs also provide evidence that on at least seven occasions between the effective date of the IMA, on April 6, 2018, to shortly after the sales on March 10, 2020, Master Fund, Armistice Capital, and Mr. Boyd jointly filed reports on Schedules 13G and 13D indicating that each of them—including Master Fund—had shared power to dispose of and vote Master Fund's shares in Aytu's common stock.[2] For example, on a fifth amended Schedule 13D/A, filed 20 days before the date of the sales at issue in this case, Master Fund, Armistice Capital, and Mr. Boyd list Master Fund as having "shared voting power" and "shared dispositive power" with Armistice Capital and Mr. Boyd. (Doc. # 77 at 346.) The form also includes the following statement in answer to Item 5:

> Each of the Reporting Persons has the sole power to vote or direct the vote of 0 Shares and the shared power to vote or direct the vote of 12,362,140 Shares. Each of the Reporting Persons has the sole power to dispose or direct the disposition of 0 Shares and the shared power to dispose or direct the disposition of 12,362,140 Shares.

(Doc. # 77 at 346, 353.) Furthermore, on the signature page, Armistice Capital and Mr. Boyd each have an asterisk next to their name, with the following note:

> * The Reporting Person disclaims beneficial ownership of the reported securities except to the extent of his or her pecuniary interests therein, and this report shall not be deemed an admission that such person is the beneficial owner of these securities for

---

[2] On these forms, any 5% or more holder of stock in a publicly traded company is required to report the number of shares that they "beneficially own" for purposes of Section 13(d) of the Securities Exchange Act.

purposes of Section 16 of the U.S. Securities Exchange Act of
1934, as amended, or for any other purpose.

(*Id.* at 354.) There is no asterisk next to Master Fund's name, thus indicating that

Master Fund did not disclaim beneficial ownership for the same purposes.

Plaintiffs also point to evidence that within the timeframe of the IMA, Master Fund

unilaterally exercised powers that, under Master Fund's delegation theory, belonged

exclusively to Armistice Capital. (Doc. # 76 at 18–19.) On October 10, 2019, Aytu

purchased certain assets from another pharmaceutical company, Cerecor, Inc., and

assumed an obligation to pay a third party over $16 million. *See* (Doc. # 77 at 574–82.)

In order to facilitate the deal, Master Fund agreed to guarantee Aytu's assumed

obligations to Deerfield and executed the guarantee directly, with Mr. Boyd signing as

its director on its behalf. (*Id.* at 579.) Pursuant to a separate agreement, Master Fund

placed $15 million in an escrow account to secure its guarantee and again executed the

Escrow Agreement directly, with Boyd signing for Master Fund as its director. (*Id.* at

599.) Lastly, Master Fund entered into a "Shareholder Voting Agreement" in connection

with the Cerecor transaction in which Master Fund as a named security holder agreed

to vote shares in accordance with the agreement. (*Id.* at 583–84.) Plaintiffs argue that

the Cerecor transaction agreements show that Master Fund maintained and exercised

its own voting power, notwithstanding the IMA.

For its part, Master Fund cites to the declarations of its three directors, Mr. Boyd,

Mr. Bennett and Mr. Phillip. Each declaration, executed in January 2023, states that it

was the director's understanding that the IMA "gave Armistice Capital exclusive

authority to invest Master Fund's assets, make all investment decisions, conduct all

17

investment research, and vote all underlying securities on behalf of Master Fund" and that Master Fund itself "would retain no such authority." (Doc. # 86-3 at 5; Doc. # 86-4 at 5); *see* (Doc. # 86-2 at 4) (Boyd declaration stating the same language differently). Because these Declarations speak only to each director's opinion of the IMA, and because interpreting a contract is a question of law for the Court to decide, the Court finds that these declarations are insufficient to create a genuine dispute of material fact as to the issue of whether the IMA effectively delegated beneficial ownership. *See Paul*, 974 A.2d at 145 ("Questions concerning the interpretation of contracts are questions of law, which we review *de novo*."); *see also Greenfield*, 213 F. Supp. 3d at 515 ("[I]t is not necessarily the case that a party which has executed a contract purporting to delegate such authority has effectively done so.")

For the foregoing reasons, the Court concludes that Plaintiffs have established that Master Fund was a beneficial owner for purposes of their Section 16(b) claim. The Court therefore grants in part Plaintiffs' Motion for Summary Judgment (Doc. # 76) and denies in part Master Fund's Motion for Summary Judgment (Doc. # 86) on the issue of whether Master Fund is a beneficial owner.

## C.    DIRECTOR BY DEPUTIZATION

The second issue raised by both motions for summary judgment is whether the acquisitions are exempt from liability under Rule 16b-3 on the basis that Master Fund was a "director by deputization" of Aytu.

Rule 16b-3(d) "provides selective relief from Section 16(b)'s otherwise blanket ban on short-swing profits by exempting transactions between the issuer and an officer

or director" as long as "the 'transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors.'" *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 246 (2d Cir. 2008) (quoting 17 C.F.R. § 240-16b-3). The SEC adopted this rule "exempt[ing] non-compensatory issuer-insider trades because they 'do not appear to present the same opportunities for insider profit on the basis of non-public information as do market transactions by officers and directors.'" *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 948 (9th Cir. 2006) (quoting Ownership Reports and Trading by Officers, Directors and Principal Security Holders, 61 Fed. Reg. 30,376,30,377 (June 14, 1996)). Essentially, the SEC reasoned that where the issuer is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants as contemplated by Section 16(b). *Id.*

In order to prove that the transactions are exempt pursuant to Rule 16b-3(d), a defendant must show (1) that it acquired the securities directly from the issuer; (2) that the acquisition was made by an officer or director of the issuer; and (3) that the transaction was "approved by the board of directors" of the issuer or "approved or ratified" by a vote of the issuer's shareholders. 17 C.F.R. § 240.16b-3(a) and (d)(1)–(2); *see Gryl ex rel. Shire Pharmaceuticals Grp. PLC v. Shire Pharmaceuticals Grp. PLC*, 298 F.3d 136, 141 (2d Cir. 2002). In this case, with respect to the October Acquisitions, there is no dispute as to the first and third elements: Master Fund purchased the securities from Aytu, and the acquisitions were approved by the Aytu Board on October

10, 2019, and by shareholders on January 24, 2020. The second element—that the purchase was made by "an officer or director" of the issuer—is the only contested issue for Master Fund's Rule 16b-3 affirmative defense.

Master Fund argues that it is exempt from Section 16(b) liability because it was a "director by deputization" of Aytu through Mr. Boyd's role as a director on the Aytu Board. (Doc. # 86 at 22.) Courts have consistently recognized that an entity, like Master Fund, "would count as a director under Section 16(b) if it 'deputized' a person on the board of directors to act on its behalf." *Roth*, 522 F.3d at 246 (quoting *Blau v. Lehman*, 368 U.S. 403, 410 (1962)); *see Dreiling*, 458 F.3d at 952 ("[A] corporation may be a virtual director, and thus an insider for purposes of §16(b) liability, by deputizing a natural person to perform its duties on the board."); *see also Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969) (collecting cases regarding deputization and stating "[i]n light of the above authorities, the validity of the deputization theory, presumed to be valid here by the parties and by the district court, is unquestionable"). Accordingly, courts have determined that Rule 16b-3(d)'s exemption "is available to a director or director by deputization that also holds more than 10% of the issuer's publicly traded shares." *Roth*, 522 F.3d at 248; *Dreiling*, 458 F.3d at 952 ("[D]irectors by deputization are entitled to seek the protection of Rule 16b-3(d) to the same extent, and on the same terms, as an individual director or officer.").[3]

---

[3] As a final argument in Plaintiffs' Motion for Summary Judgment (Doc. # 76 at 29–30) and Plaintiffs' Response to Master Fund's Motion for Summary Judgment (Doc. # 102 at 25–30), Plaintiffs ask the Court to disregard existing precedent stating that Rule 16b-3 applies to directors by deputization, find the SEC's position clearly erroneous, and overrule the SEC's interpretation. The Court finds the analysis addressing the issue in *Roth* and *Dreiling* persuasive

"[T]he issue of deputization is a question of fact to be settled case by case and not a conclusion of law." *Feder*, 406 F.2d at 263. As this Court has previously noted, there appears to be no dispositive or controlling Tenth Circuit decisions on the standard for deputization, and few courts in other districts have addressed the issue. *See Rubenstein*, 2015 WL 1509761, at *2; *see also Calenture, LLC v. Pulte*, No. 21-cv-402 (PKC), 2022 WL 912947, at *3 (S.D.N.Y. Mar. 29, 2022) (observing that guidance from the Second Circuit "on the applicable standard to determine whether deputization has occurred is limited, as are district court cases that have fully litigated the issue"). However, the parties agree on several relevant factors that the Court should consider in assessing whether Master Fund should be deemed a director by deputization. *See* (Doc. # 86 at 23; Doc. # 103 at 15–16.) These factors include whether:

- the shareholding entity recommended the director for election or appointment to the board;

- the shareholding entity recommended the director for the purpose of protecting or representing the entity's interests rather than for the purpose of guiding or enhancing the issuer's business activities;

- the director regularly gained access to material nonpublic information about the issuer;

- the director shared the confidential information with the entity; and

- the shareholding entity used the information to inform its investment strategy regarding the issuer's securities.

---

and declines Plaintiffs' invitation to depart from precedent. *See Roth*, 522 F.3d at 248–49 (giving *Chevron* deference to the SEC's opinion on whether transactions exempted by Rule 16b-3(d) are comprehended within the purpose of Section 16(b)); *Dreiling*, 458 F.3d at 949–52 (same).

Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide*, 229–30 (5th ed. 2019). At least one other district court has considered the same factors in conducting a deputization analysis. *See Calenture*, 2022 WL 912947, at *3–4.

Upon carefully reviewing both motions for summary judgment and the evidence cited to by the parties, the Court finds that genuine disputes of material fact preclude summary judgment on the issue of whether Master Fund was a director by deputization of Aytu through Mr. Boyd. These genuine disputes of fact include, but are not limited to:

- whether Mr. Boyd was invited to join the Aytu Board to serve as Master Fund's representative because of Master Fund's investment or whether he was invited to join based on his individual qualifications and experience;

- whether Aytu or Master Fund considered Mr. Boyd's service as a director on the Aytu Board to be linked to Master Fund's investment;

- whether Master Fund considered itself a director by deputization of Aytu;

- whether Master Fund actually functioned as a director of Aytu through Mr. Boyd;

- whether Master Fund had any role in placing Mr. Boyd on the Aytu Board; and

- whether Master Fund had any knowledge regarding Mr. Boyd joining the Aytu Board when he joined.

Because of these and other genuine disputes of material fact, summary judgment is inappropriate on the matter of whether the transactions are exempt pursuant to Rule 16b-3. It will be for the trier of fact to weigh the evidence presented by both parties,

make credibility determinations, and decide whether  Master Fund served as a director by deputization of Aytu through Mr. Boyd. *See Feder*, 406 F.2d at 263.

## D.   SETTLEMENT AGREEMENT

Lastly, Master Fund argues that Plaintiffs' claims are "foreclosed" by the settlement agreement between Aytu and Armistice, in which Aytu released all purported Section 16(b) claims existing as of March 12, 2020. (Doc. # 86 at 29–30.) Plaintiffs argue that Master Fund waived this defense by failing to plead it. (Doc. # 102 at 21–22.) Moreover, Plaintiffs contend that the plain terms of the settlement agreement do not bind Plaintiffs or bar their claims. (*Id.*) The Court agrees with Plaintiffs.

### 1.   Waiver

Federal Rule of Civil Procedure 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." The rule lists "release" as an enumerated affirmative defense. Fed. R. Civ. P. 8(c); *see Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1274 (10th Cir. 2012). "As a general rule, a defendant waives an affirmative defense by failing to plead it." *Burke v. Regalado*, 935 F.3d 960, 1040 (10th Cir. 2019). The purpose of pleading an affirmative defense "is to give the opposing party notice of the [defense] and a chance to argue, if he can, why the imposition of [the defense] would be inappropriate." *Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (quoting *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)). Accordingly, the Tenth Circuit has held that in considering "whether an affirmative defense may first be raised in a motion for summary judgment," the court should "apply the same standards that govern motions to amend"—i.e.,

23

whether there is prejudice to the opposing party or other grounds to deny the constructive amendment of the answer "such as undue delay, bad faith or dilatory motive . . ., or repeated failure to cure deficiencies by amendments previously allowed.'" *Id.* at 1202 (quoting *Harris v. Sec., U.S. Dept. of Veterans Affairs*, 126 F.3d 339, 345 (D.C. Cir. 1997)); *see also Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir. 1995) ("Rule 8(c)'s core purpose [is] to act as a safeguard against surprise and unfair prejudice. . . Where, as here, a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it, a mere failure to plead the defense more particularly will not constitute a waiver.").

Plaintiffs argue that Master Fund "neither pleaded the settlement nor gave Plaintiffs any other notice that it demanded judgment on that basis." (Doc. # 102 at 22.) Furthermore, Plaintiffs contend that Master Fund (1) failed to mention the settlement agreement as a defense for purposes of the Scheduling Order entered in this case (Doc. # 75 at 4); (2) failed to mention the settlement agreement in response to Plaintiffs' interrogatory asking Master Fund to describe its "claims and contentions in the Action" (Doc. # 86-20 at 3–4); and (3) made no mention of the defense in any "other paper that Master [Fund] served or filed in this case" (Doc. # 102 at 22). Plaintiffs assert that had they "been given any hint that the settlement agreement would be pleaded as a bar to their litigation, they would have sought discovery of those facts, including depositions of the key actors and relevant document production." (Doc. # 102 at 23.) However, because discovery is closed, Plaintiffs argue that they are now prejudiced by Master Fund's untimely defense.

In a single paragraph addressing the settlement in its Reply, Master Fund does not dispute any of these points. (Doc. # 109 at 15.) Instead, Master Fund argues merely that the settlement "was publicly disclosed in the March 12 Form 4, before Plaintiffs ever sent a demand letter in this case" and that "Master Fund produced the Settlement Agreement to Plaintiffs in September 2021, and produced communications regarding the Settlement Agreement dating back to August 2021." (*Id.*) Master Fund otherwise makes no arguments addressing prejudice or its failure to timely amend its answer or affirmatively assert its defense.

The Court finds that Plaintiffs have adequately shown prejudice as a result of Master Fund's failure to timely plead or raise its affirmative defense regarding the settlement agreement. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1225 (D. Utah 2018) (stating that a defendant may not assert a defense "for the first time in a motion for summary judgment after the close of discovery"). As such, the Court concludes that under the circumstances presented in this case, Master Fund has waived its affirmative defense that Plaintiffs' claims were released by the settlement agreement.

2.    Settlement Agreement

Even if the Court were to find that Master Fund had not waived its defense, the Court would find that Plaintiffs' claims are not barred by the settlement agreement.

A shareholder may bring a Section 16(b) claim "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." 15 U.S.C. § 78p(b). Generally, Section 29(a) of the Securities Exchange Act of 1934 "forecloses anticipatory waivers or

releases of a Section 16(b) claim." *Donoghue v. Bohemian Investments LLC*, No. 15-cv-01279-PAB-KLM, 2016 WL 9738103, at *3 (D. Colo. Sept. 30, 2016) (collecting cases). However, "[c]ourts have held that Section 29(a) does not prohibit parties from executing valid releases in connection with securities fraud claims that have already matured." *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 490 (S.D.N.Y. 2005). This interpretation "enables parties to reach binding settlements regarding existing securities fraud disputes." *Id.* Thus, settlement agreements may be binding "as to mature, ripened claims of which the releasing party had knowledge before signing the release." *Goodman v. Epstein*, 582 F.2d 388, 402 (7th Cir. 1978).

The settlement agreement executed between Aytu and Armistice Capital and its affiliates, including Master Fund, provides that Armistice Capital "will pay AYTU the full amount of disgorgeable profits of $92,879.95" for profits realized on March 10, 2020. (Doc. # 86-18 at 2.) On a Form 4 reporting the March 10 sales, Master Fund disclosed that the $92,879.85 settlement payment represents the profit realized by matching the March sales "against previous purchases of common stock . . . made in December 2019." (Doc. # 102 at 24; Doc. # 77 at 408.) Thus, it does not appear that the settlement agreement addresses the October Acquisitions, and Plaintiffs contend that Master Fund still has a remaining liability of $11,163,446.67. (Doc. # 76 at 15.)

Master Fund relies on *Donoghue*, in which United States District Judge Philip A. Brimmer cited the above case law and stated that the key to a settlement's enforceability for a Section 16(b) action is that (1) the liability was genuinely disputed and uncertain; and (2) the Section 16(b) claim was mature at the time it was settled.

2016 WL 9738103, at *3. Master Fund argues that these factors are met by the instant case and contends that the settlement agreement "broadly released and discharged Armistice, including Master Fund, 'from any and all liability and damages . . . known or unknown, under Section 16.'" (Doc. # 86 at 29–30.) The Court agrees with Plaintiffs that *Donoghue* is distinguishable because the settlement agreement in *Donoghue* bound all "shareholders," whereas the instant agreement does not release shareholder claims. *Compare Donoghue*, 2016 WL 9738103, at *2, *with* (Doc. # 86-18 at 2–3). Moreover, it does not appear that the settlement agreement addressed the October Acquisitions, and there is little evidence regarding the settlement agreement before this Court because Master Fund raised the issue only after the close of discovery.

For these reasons, the Court finds that the settlement agreement is inadequate to foreclose Plaintiffs' Section 16(b) claim and rejects Master Fund's untimely defense.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED as follows:

- Plaintiffs' Motion for Summary Judgment (Doc. # 76) is GRANTED IN PART and DENIED IN PART. The Court GRANTS Plaintiffs' Motion for Summary Judgment to the extent that it finds that Master Fund was a beneficial owner for purposes of Plaintiffs' Section 16(b) claim. The Court DENIES Plaintiff's Motion as to the remaining disputed issues.

- Defendant's Motion for Summary Judgment (Doc. # 86) is DENIED.

DATED:  August 30, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge